Good morning, your honors. May it please the court, Jared Gemmer on behalf of the appellate Dennis Hebert. Our appeal raises three issues, and I aim to address all three, if time allows. The government's evidence was insufficient to permit a rational jury to find that Mr. Hebert is an Indian person beyond a reasonable doubt. The government's evidence did not prove that Mr. Hebert lacks a degree of Indian blood, nor did it prove the absence of any recognition. The government presented four... Well, it just had to prove one, right? They only have to prove the absence of one, your honor. That's correct. And the government's weak evidence on this, it presented four witnesses. Its weak evidence was further weakened by the failure to ask key questions of those witnesses, and actually a fifth witness that the parties haven't significantly discussed in briefing. Starting with Mr. Hebert's stepdaughter, I think she's probably the star of the show for the government. The first thing she's asked is, just from being his stepdaughter, does she know if he's a member of an Indian community? And also limits the question to membership. She says not that she knows of. The government then asks her, has he ever said he was an Indian? The government does not confirm with her that she actually understands what that means in a legal sense. The following question, she says that no, she has not heard him describe himself as an Indian, asks about his racial identity, how he's self-identified. She says part Mexican. I think that contextualizes the prior question. She understands Indian to be a racial concept in this moment because it's not asking, has he ever been associated with a tribe? Has he ever received benefits? Do you know if he has any blood at all from Indian ancestry? Then we can quickly turn to Investigator Grantham. Grantham says that Mr. Hebert identified himself as Hispanic Latino. Investigator Grantham also says he contacted the five major tribes. Notably, he never actually says they responded to his contact, never even says what he asked of them. Investigator Grantham also states that he had access to the Choctaw Nation's membership database, never actually says he used it to look up Mr. Hebert's status. Can I ask you a question? I don't want to interrupt your train of thought. Is there evidence in the record about where Mr. Hebert was born? So I don't believe it came about at trial. I believe the PSR, and I'm not 100% certain of this. Well, sufficiency of the evidence, do we consider the PSR? For sufficiency of the evidence, no, Your Honor. All right. So if, and Dakota Grantham, or Investigator Grantham, was asking about the five tribes that are most prevalent in Oklahoma. If he was born in California, the five tribes that are most prevalent in California are completely different, five tribes, right? Absolutely, Your Honor. In most states that have a sizable Indian population, there are a variety of tribes that are most prevalent, right? Absolutely, Your Honor. All right. So, all right. You may proceed. And that dovetails nicely with one of my key points. The only evidence in the record of Mr. Hebert's connection to Oklahoma, and in theory, these five major tribes, is the time happened in Oklahoma. He, prior to this crime, lived in Texas. We hear that Ms. Byers testifies that he lived in Texas with her mother at the time. That was why he ended up in Oklahoma. There was a fight. So moving forward to Special Agent Sincer, Special Agent Sincer never actually testifies that Mr. Hebert identified as any particular race. He was simply asked, did Mr. Hebert spontaneously declare himself to be Indian or Native American? The answer was no. Paul Spark is similar to Investigator Grantham. He did contact the five tribes, but again, he never actually testifies that any of those tribes responded. And to give an example of this, I've contacted a particular BOP official to set up an attorney-client phone call. I've never gotten a response from that official. I've had to email multiple times with no response. It could be that the government did not ask about if he received a response and what that response was, because that might have triggered a hearsay objection. But there is now no evidence that he actually got a response. The fifth witness that neither party significantly discussed in briefing said nothing about Mr. Hebert at all. That is Erica Tomlinson, and her testimony is at volume three, pages 286 through 290. She's employed by the Choctaw Nation in the Tribal Membership Department. Her purpose was to testify about KD's membership in the Choctaw Nation and his degree of Indian blood. She confirms that he has both. She has never asked if Mr. Hebert is a member of the tribe, even though she has access to that database, and the crime allegedly occurred within the Choctaw Nation's boundaries. On cross-examination, counsel for Mr. Hebert specifically asked, can you confirm if a person is not a member of the Choctaw Nation? Erica Tomlinson says yes. No further questions from the defense. The government then chooses to not redirect, even though that softball was tossed up in the air. So we have these five witnesses who say nothing about his recognition in a tribe, and we have five witnesses who, in some degree or another, speak about his claim of racial identity. And that brings us to, I think, what is really this underlying problem. Could I just ask you, now that you've gone through the government's evidence, was any of the government's evidence controverted? I suppose that depends on how we define controverted, Your Honor. Mr. Hebert did not present his own evidence. He is not obligated to do so. Mr. Hebert's counsel did, at least sometimes, challenge these witnesses on either the basis of their knowledge or what knowledge they actually had. For example, as to Investigator Grantham, the counsel asked, did you actually get any written documentation from these tribes? He says no. As to Paul Spark, there was really nothing to say. I contacted five tribes. It was essentially the same as Dakota Grantham. Counsel did not challenge specifically Kara Byers' testimony, but I don't think Kara Byers really said anything significant. She said that, to her knowledge, he had not claimed to be a member, and she'd not heard him say he was an Indian. But again, this is all being viewed through the prism of race. The government's entire case is brought through the prism of race. They keep trying to bring in, he identified as white. Let me just ask you a question there, because you spent a lot of time in your briefing about this point. And so my question to you is whether, well, let me back up. As I understand your argument, racial identity is not the same thing as Indian status. But my question to you is, can it be relevant? Is it relevant evidence? Insofar as the question of admissibility goes, Your Honor, I think it has its role to play. And it has to be viewed through a broader prism. There wouldn't be a proper objection for it. I don't think that would be correct. But the question of whether evidence is relevant and whether it's sufficient to sustain a conviction, there's a pretty wide gap there, because the bar for relevance is, frankly, about as low as these carpet fibers sometimes. Well, one reason I'm asking you this, something caught my eye in your brief, where you cited a study stating that 18% of U.S. Latinos have Native American ancestry. And so I was thinking when I read that, well, then it must have some relevance, because you're actually citing this study. It has relevance in the sense that I'm trying to push a little bit back against this idea that I used it there to say, well, the government is claiming he says he's Latino. That means he's not Indian. Just period. That just means he's not Indian. And my point in citing that study is, actually, him saying he's Latino indicates he probably has Indian blood. Now, that's obviously not in the record for sufficiency purposes. But the idea that him saying he's Latino, he's Hispanic, he's white, categorically means he's not Indian is, frankly, scientifically absurd. Let me, let me, I'm sorry. You went through all the things that the government could have done with the witnesses it had that would have bolstered its position. Let's say it had done all that and got favorable responses. You'd still be saying it's not enough. Of course, Your Honor. Yes. So I think you're making a very good case here for the En Palm Court to set aside our precedent saying the burden is on the government. It's outrageous. It just makes no sense to make the government prove that someone is an Indian when it, I think the other circuits who have addressed it have said the burden is on it. The Supreme Court precedent on who has the burden certainly suggests that the government, don't you agree there's no way to prove, to disprove, to prove a negative. And you would, every case, someone with your intelligence will make a very strong argument that the government didn't do it. I agree that these arguments will always come up, Your Honor. I don't necessarily think this is the case for en banc review. I understand Your Honor's concerns. Part of the challenge here is a case like Diaz. I agree this is not Diaz. But Diaz really gives the government a blueprint, which is bring in a witness who actually knows. Well, yeah, but how often are you going to have a dad who has done hundreds of years of genealogical research? You know, I mean, you can do genealogical research in my family, you will not find anybody that has done what Mr. Diaz did. So that's quite an exceptional circumstance. Yes, Your Honor, I agree. Diaz, we shouldn't put the bar up at Diaz. That's too high. But we do have a father who obviously is in one of the best positions anyone can be to speak to their own child's ancestry, even without the genealogical research. Well, we have a stepdaughter, too. So let me ask you a hypothetical question, if I might, about that. Let's say that I am a defendant of a crime that takes place on Indian country. The victim is Indian. And so the question is whether or not I am an Indian. And one of the witnesses is my wife, who's been married to me for 30 years. And the question to my wife is, has he ever said that he has any Indian blood? No. Has he ever been to a powwow? No. Has he ever, you know, done anything to indicate that he thinks he's part Indian? No. And now, would that be sufficient viewing of the evidence and the like most favorable to the government to find that I am not an Indian, at least, well, under either of the Prentiss-Duprox? I think a spouse is probably second best to either a parent or a sibling. And so how do we say, okay, a dad's good, a wife's good, stepdaughter not so good? I think the problem is stepchildren and stepparents have wildly varying relationships with each other, from one family to the next. Sometimes stepchildren are not particularly close. Sometimes they're friendly. Sometimes they are extremely close to the point of practically being adopted. We heard that Ms. Byers has known Mr. Hebert for a long time, and he was willing to send money to her to help with bills. She was willing to allow him to live with her for a short period of time when he was down on his luck. But that doesn't necessarily tell us that she knows a lot about his ancestry or his personal dealings, say, tribal affiliations. We know her son is Indian. There was never any testimony that she spoke about that subject with him. That could have been important testimony that might have helped make this a much more challenging question from my perspective. The idea that they had spoken about being Indians, and maybe he had said, no, I don't have any tribal affiliation. I wish I did. Free health care then. So I see I'm very close to running out of time. I want to touch on the second issue very quickly and the third. As to the jury instructions, the instructions never told the jury what facts it has to follow. Can I just zero in on that one? Yes, sir. Let's assume that it was error not to have an instruction. Let's assume it was plain. Have you shown, could you show that on step three of plain error review that it affected your client's substantial rights? And let me just add one other part to this. Is that showing different from your burden on sufficiency of the evidence? Have you thought about that? I have, Your Honor. Good, because I need some help from you on that. So what do you say? I think that even if the evidence is sufficient, that's a very, that's actually a pretty low bar in a generalized sense when we're talking about this issue, because we view the evidence in the light most favorable to the government in any rational fact finder. If the evidence was sufficient, it's still, there was still a harm to Mr. Hebert's substantial rights because the entire prism through which this evidence was presented was racial in nature. And it invited the jury to make a finding based on racial classifications rather than the actual facts that it had to find, which was either the absence of blood, which we can generally understand is unlikely for an American citizen in this country that has more than a few generations of American ancestry, but also, or the absence of recognition. They were simply told, he's claimed to be Mexican. He's claimed to be white. His stepdaughters never heard him say he was an Indian. Oh, and by the way, he never spontaneously declared himself to be an Indian to two law enforcement officers, even though he'd been read his Miranda rights. I have, I am out of time. I thought your third issue was the most interesting. Ms. Epperle. May it please the court, my name is Linda Epperle. I represent the United States as we struggle once again with the requirements for proving non-Indian status under Section 1152. It's easy to develop a very limited view of looking at 1152 and how you do or do not prove the defendant's Indian status. However, it's helpful to look at the clear distinction that was drawn in the in the Whitehorse case in South Dakota by Judge Karen Schrier, who was sitting by designation with the Eighth Circuit. And she noted the complementary nature between 1152 and 1153. In that case, as here, there was no evidence controverting the facts of this assault. The only issue comes down to whether that defendant is Indian or not Indian, because the victim is Indian. And in that case, she said, the defendant is either an Indian or he is not. Between those two options, 1153 and 1152, that would apply to all defendants of either race. The difficulty, as this court has struggled with, is how to have a jury make that determination when those are actually two separate statutes. But there is an affirmative defense in the Eighth Circuit. Yeah, that's true. And I know that the arguments as to antelope and whether or not being an Indian is a race-based classification versus a political classification, this court is well aware of those. During the Prentiss litigation, the government argued, relying on antelope, that Indian blood should not have been part of this test. It was rejected by this court back then. And I think there's a difference between saying someone is racially an Indian under this court's law and determining whether or not they have any Indian blood. Well, but here we are. Here we are. And a charging, I mean, once there's a charging decision, and there was a charging decision made here, and I suppose in hindsight, one can say, well, questions should have been asked. Certain things maybe should have been done. The evidence either could have been stronger or maybe it even could have gone the other way. But once the case is charged, that doesn't stop further investigation. And so, again, here we are, and we have this evidence. And under our sufficiency of the evidence standard of review, it's a very favorable standard to the government. But where I start to have some issues is the beyond a reasonable doubt part of it. And so I'm interested in how the stepdaughter's testimony or the contacting of the five major tribes, how does that get you past the beyond a reasonable doubt? How does it permit an inference of non-Indian status beyond a reasonable doubt? Again, this court is limited by, as a jury is, trying to determine whether there is any reasonable doubt, not trying to figure out whether there is any doubt. When we look at family relationships, the court mentioned, you know, a father or the opposing counsel did. A father might have a good idea, certainly the father did in the prior decision of this court. And there was some criticism from opposing counsel regarding the relationship that stepchildren may have with their parents and whether or not that would be sufficient. If this court attempts to state, you know, parents are okay, grandparents are okay, these are the only categories that qualify, that's going to create additional problems. Because we all know that there are parents who are estranged from their children. We have cases where there are defendants that are adopted who have no idea who their parents are. So we cannot rely on that. And what instead we look to, or what this court has looked to in prior cases, is whether or not there is a reasonable basis to believe that the comment that was made by that relative is within their reasonable understanding of the circumstances. Because we're looking at totality. To draw the reasonableness of the inference, don't we have to have a foundational basis for the witness, Gary Byers, or my hypothetical, my wife, to know either through genealogical research as the father did or through some other testimony. You have to have that foundation, don't you? No, I believe it can be based on the reasonable knowledge of a family member. Okay, let's say that. Let's say we agree with you. And let's say hypothetically I have one 364th of Indian blood. I've never done genealogical research, and in my hypothetical nobody in my family has. So variant of my question to defense counsel, and that is, so my wife or my father or my mother, maybe all of my family members say they've never heard Bob Bacharach say whether or not, say that he has any Indian blood. Well, why in the world would they know if I don't know that I have one 364th of Indian blood? And if I have one 364th of one of the 574 tribes that are federally recognized, then I would satisfy at least that element of premise two, correct? That's correct. And so why should we draw any meaning to Carrie Byer's testimony if she had no information about whether or not he had actually any Indian blood? All she knows is, like in my hypothetical, that Mr. Heber didn't know he had Indian blood. Well, why would he know that he had Indian blood if he had never done any genealogical research? The judge's question is certainly reasonable, particularly within Oklahoma, where we have tribes that don't have a blood quantum requirement. But the only way, and again I come back to that concept of reasonableness, the only way for us to know for certain would be to do DNA testing, send it off to ancestry or somewhere, and have a company come back with all of that genetic makeup. That's just probabilistic anyway, isn't it? It's what? Just probabilistic anyway, isn't it? Yes, that's just a probability. It's not the same as the genetic tracing. But we've got problems with requiring genetic tracing because, again, we have defendants and victims who may not know who their parents even are, much less any of their history. That's Judge Hartz's question about the correctness of Prentiss II. But we have to apply Prentiss II, at least until it's overturned in Bonk or by the Supreme Court. And so under Prentiss II, how can we adopt your position that, well, we can just infer that there was no quantum whatsoever of any Indian blood based on what? Based on the testimony of the stepdaughter, which is the family member that we have access to, who has told us she knew him for a long time. They may not have lived together, but he clearly is somebody that she talked to regularly. When he is walking on a road in Texas, that's the person he called. Just like in a drug case where we wish that our witnesses were saints and priests. In these cases, the government is stuck with the family that's put in front of us. But the prosecutor could have said, Ms. Byers, let me just kind of prove this a little bit. Ms. Byers, would you have known whether or not he had any Indian blood? That question was never asked. And without that question being asked, don't we, aren't we relegated to the realm of speculation about whether or not she would have known whether he had any quantum of Indian blood? Well, she clearly had asked him about his history to some degree, because at some point he had told her he thinks he's Mexican. And again, there's a fine line to be walked between talking about quantity of Indian blood and whether or not you're talking about a racial distinction or distinction for purposes of premise. We recognize that. Part of what would make this all so much easier, so much more reasonable, not just for the government, but for all litigants and for the court, is to, as we have suggested in the past, make this an affirmative defense. Give us some parameters. Otherwise, I mean, even... You know this panel can't. Excuse me? You know this panel can't. I understand. You can always ask for an en banc, though. I always feel the need to raise this, because the more cases that we have handled in Oklahoma, the more we realize bizarre fact patterns that you just can't prove. Well, counsel, one of the fact patterns here is that he had an Alabama and Florida driver's license and he had lived in Texas. And there's nothing to indicate that anyone checked to see if he was a member of a tribe in one of those states. Isn't that a problem? I can see where somebody might want to talk to the tribes in Florida, the Miccosukee, the Seminole, the tribes in Georgia, Porch Band Creeks, the tribes in Louisiana, now that we know that that's where he's from, based upon the PSR. We could have looked at various tribes in Texas. But none of that matters for purposes of whether or not in this case there was sufficient evidence. Well, it certainly matters for Dakota Grantham's testimony, doesn't it? If he's saying, I checked at five tribes in Oklahoma, and he doesn't say, I checked at five tribes in... I mean, why would it matter what tribes are prevalent in Oklahoma if he just moved here from Louisiana? Well, because we are not privy to a lot of that information. We're not privy to what tribe he may or may not have been involved with. We didn't know that he was born in Louisiana until after. I'm not defaulting anybody, but I'm just saying in terms of whether or not we can draw a reasonable inference, viewing the evidence favorably to the government, beyond a reasonable doubt, that he was not a member of a tribe based on the contacting five tribes in some place that he happened to have moved to. In that case, at the time that that officer was doing the evaluation, I don't know that he knew those facts. Sure. Yeah, I'm not faulting the investigator. I think that the defense brief indicates their view is that we should have proof from, DNA proof from all of the 574 tribes. That's clearly not reasonable. We know that there is, and I don't believe it was Aaron not to instruct on this, but there are the social factors that you can look at as to whether or not someone is an Indian, as Judge Bacharach has indicated in his prior opinions. A tenant said a powwow, an Indian who had a hunting and fishing licenses, federal services. But are we going to require the government to call people from IHS and agriculture department and housing and all of the federal agencies to prove that they didn't get any benefits? Are we going to explore all powwows, have someone there undercover to see if that person has been there? And again, where do you draw the line there? Are we going to require in Oklahoma particularly for somebody to go to the various Indian churches and find out if that person has ever been a member? Are they going to have to go to every stomp ground? Are they going to have to go to every Indian art show and prove that a defendant never attempted to enter a painting or sculpture? You can take this to the logical extreme, and that is what keeps us up at night, and I'm sure this court is trying to struggle with this question. Could I just pivot to the jury instruction issue for a minute? The court didn't instruct on what it means to be an Indian or non-Indian. We have the standard, the two-part standard. And my question is, how could a jury make a factual finding on non-Indian status without some guidance on what those factors are? I think that we look to a jury making a decision based upon their common sense and what they understand as individuals. We don't tell people a specific way. But is it common sense that you have these two factors? Would a reasonable juror just intuit that without having any guidance? And if it was error not to give the jury some guidance, why wouldn't there be a reasonable probability, at least, of prejudice when the jury was at sea on what a non-Indian or Indian is? I see I've run out of time. Could I answer the court's question? Yes, please. Just briefly. Again, this is a case where really the only issues were blood and membership. There was no proof of any of the social factors, so eliminate that. The court gave what was reasonably, just gave the introduction that this court has required. Some judges are giving that more involved instruction, but I believe that may be in cases where there's some proof about it. What we risk here in giving them additional factors to consider is if there's no evidence presented on it, it may confuse a jury. It may insinuate to the jury that the government should have gone out and done all of these other things to disprove them. All the United States had to do was disprove one of those factors. In other words, he's not Indian, he's not a member, and that is sufficient. That the court did here, and for that reason we would ask this court to affirm. Thank you, Counsel. Case is submitted. Counsel are excused.